UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. CR 22-85 (NEB)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Mohamed Jama Ismail, )<br>)<br>Defendant. ) | **DEFENDANT'S MOTION FOR VARIANCE AND POSITION REGARDING SENTENCING** |

The Defendant, by and through his attorney, Patrick L. Cotter, and pursuant to U.S.S.G. § 6A1.2, and Local Rule 83.10, respectfully submits the following position regarding sentencing in this matter.

## INTRODUCTION

The Defendant, Mr. Ismail, will soon come before this Court for sentencing following his guilty plea to *Use of a Passport Secured by False Statement*, in violation of 18 U.S.C. §§ 18 U.S.C. § 1542. The Presentence Investigation Report ("PSR") indicates that the applicable sentencing range under the advisory United States Sentencing Guidelines is 6-12 months, based upon a total offense level of 10 (after an acceptance of responsibility reduction) and a criminal history category of I. (PSR at ¶ 57). Mr. Ismail moves the Court for a downward variance from the guidelines sentence.

As outlined below, Mr. Ismail's personal history and characteristics, acceptance of responsibility, lack of criminal history, and hard time presentencing detention for a period of over seven months support a modest downward variance and sentence of probation.

# ARGUMENT

I.  **THE § 3553(A) FACTORS SUPPORT SENTECING MR. ISMAIL TO A SIX-MONTH PRISON SENTENCE WITH ONE YEAR OF SUPERVISED RELEASE.**

Federal sentencing is governed by Title 18, U.S. Code, § 3553(a). Section 3553(a) requires sentencing courts to consider seven factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the sentencing range established by the guidelines;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

After considering all of these factors, a court must "impose a sentence sufficient, but not greater than necessary" to achieve the goals of 18 U.S.C. § 3553(a). In doing so, this Court may not "presume that the guidelines sentence is reasonable." *Gall v. U.S.*, 128 S.Ct. 586, 590 (2007).

1. **The personal characteristics, history, acceptance of responsibility, lack of criminal history, and significant presentencing detention support a modest downward variance to probation.**

   a. **Personal History and Characteristics.**

Mr. Ismail's background and character is unique and supports a variance to probation.

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an *individual* and every case as a *unique study* in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Koon v. United States,* 518 U.S. 81, 113, 116 S. Ct. 2035 (1996) (italics added).

Further, sentencing judges have a "wide discretion" in the types of evidence they can consider when imposing sentences. *Williams v. New York,* 337 U.S. 241, 246-47, 69 S. Ct. 1079 (1949). "Highly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* "No limitation shall be placed on the information" a sentencing court may consider concerning the [defendant's] background, character, and conduct." 18 U.S.C. § 3661. Several factors unique to this case favor a probationary sentence.

Mr. Ismail's background of overcoming poverty and refugee status exemplify his strong character. Born in Somalia, in 1973, Mr. Ismail was raised in a mud hut without any running water or electricity. (PSR at ¶ 31). His home had a mostly open roof, which was covered with a tarp when it rained. (*Id*). There were times where he and his family did not even have enough food to eat. (*Id*). Mr. Ismail left school at age 14 to work and support his family. (*Id*).

However, by the age of 18, he was forced to flee his Somalian home because his tribe was being persecuted and murdered by those who were in power at the time. (*Id* at ¶ 32). This happened when he was at a market, on his own, when a militia began to approach his side of the city. (*Id*). He had no choice but to flee, and he traveled by car and foot for over 300 miles with strangers to reach a refugee camp in Liboi, Kenya. (*Id*). He lost touch with his family when he fled and had to learn to survive on his own at barely 18 years old. (*Id*).

While in the refugee camp, Mr. Ismail continued to struggle through many hardships, but he survived and became stronger. (*Id* at ¶ 33). Indeed, the PSR confirms that the refugee camp that Mr. Ismail was living in was plagued by food and water shortages. (*Id*). Mr. Ismail details these hardships in his letter to the Court:

> When I arrived at the refugee camp, life was very harsh and an eye-opening experience as I had no access to basic needs such as food or water. There was an outbreak of deadly airborne and waterborne diseases such as cholera, hepatitis B, polio, and dysentery.

(Letter from Mr. Ismail).



Mr. Ismail was living on his own at the time but was able to get enough food as he looked younger than he was so officials thought he needed food for his family. (PSR at ¶

33). Mr. Ismail contracted Hepatitis and was limited to one area of the camp before he was taken to a Doctors Without Borders' hospital and was formally treated. (*Id*). After that, Mr. Ismail was taken in by a religious leader to attend boarding school. He made his attempt at education there, but contracted tuberculosis and was bullied and abused at the school. (*Id*). After recovering from tuberculosis, he went to Nairobi, Kenya with a friend to seek work. (*Id*).

While in Nairobi, Mr. Ismail was able to start building a life for himself. (*Id* at ¶ 43). He worked at a restaurant and rented his own apartment. (*Id*). Focused on finding his family, he broadcasted over a local radio station and eventually found that his family had escaped Somalia and were at the same refugee camp that he had lived at previously. (*Id*). Eventually, Mr. Ismail met his first wife Ayan Yusef and she sponsored his immigration to the United States in 1999. (*Id*).

Proud to be in the United States and having successfully escaped from death and war, Mr. Ismail worked hard. He first worked as a janitor, then at a parking garage, then he became a full-time machine operator at Polar Semiconductor, Inc. (Statement of Mr. Ismail). Mr. Ismail worked at this same company for 15 years. (PSR at ¶ 74). In 2018, while continuing to work at Polar Semi-Conductor, Inc., Mr. Ismail started a new gas station business and then expanded that business into a grocery store. (Statement of Mr. Ismail). Mr. Ibrahim Mohamad, Executive Director of the Community Resource, writes about the impact that the store had on the community:

> I have known [Mr. Ismail] since 2018. [Mr. Ismail] was a great person, active in the community. He was [a] business entrepreneur. He created Halal meat grocery store in Shakopee where community members could get their

> traditional meals, food and meat. Here in Shakopee before he opened his store, Halal meat lovers used to drive 20 miles to Minneapolis, and Saint Paul [,] but now they are enjoying the store being in Shakopee and the commute is much better.

(Letter from Ibrahim Mohamad).

Simply put, Mr. Ismail went from being a refugee—facing the potential of starvation, or being murdered—to being a successful business owner in the United States, while at the same time, benefiting his immigrant community. He was an immigrant success story.



While Mr. Ismail was working to build a life in the United States, he was also building and supporting a family. He married his current wife, Deqa Yusuf in 2003, and subsequently had five children with her. (PSR at ¶ 35). His oldest son, Muhsin Ismail, writes about the kind of man that his father is:

> I am the oldest son of Mohamad Ismail. I am 17 years old and currently in 12th grade. Growing up I always saw my father as a role model, a person whom I could come to when in distress. There [is] a saying that "perfect dads don't exist", but I disagree. Maybe not all dads are perfect, but mine sure is, and yes, I know that my dad hasn't made the best decisions, but I feel like my father deserves a second chance.

6

(Letter from Muhsin Ismail).

While Mr. Ismail was raising his family, he learned that one of his children had severe Asthma, so Mr. Ismail relocated them to Kenya, hoping that the climate would alleviate some of their symptoms. (PSR at ¶ 35) However, after Mr. Ismail was arrrested for the instant offense, he had his family return to live in the home in Savage, MN. (*Id*). Considering Mr. Ismail's significant family obligations, Mr. Ismail asks this Court consider his need to provide for his family when determining his sentence. *See U.S. v. Lehmann*, 513 F.3d 805, 809 (8th Cir. 2008) (holding that compelling family circumstances, such as the need to care for a family member, may justify a probationary sentence).

Additionally, the overwhelming community support Mr. Ismail has received since being charged is similar to the defendant in *Gall*, where the court noted that there was a "small flood" of letters from many of his family and friends "uniformly praising his character and work ethic." *Gall v. U.S.*, 552 U.S. 38, 43 (2007). Here, Mr. Ismail received a total of 13 letters of support, along with a list of 30 individuals who signed a petition supporting leniency in sentencing. Like in *Gall*, all of the letters from Mr. Ismail's community uniformly praise his character and work ethic. *Gall*, 552 U.S at 43.

For example, a letter from Ibrahim Mohamed, details some of the contributions that Mr. Ismail has made to his community. Mr. Mohmed writes:

> [Mr. Ismail] was helpful to young immigrants to be athletic and he helped [these] young kids to establish their own [s]ports teams to play soccer in the summer. Without his support these young immigrants would end up in substance abuse and violence.

(Letter from Ibrahim Mohamed, Executive Director of Community Resource Center). Each letter written in support of Mr. Ismail details a similar sentiment, that Mr. Ismail was a great contributor to his community and was a great father, husband, and friend.

In Mahamad H. Ahmed's letter, he confirms the belief that Mr. Ismail's acceptance of responsibility is evidence of his good character. Mr. Mahamad writes:

> [Mr. Ismail] is usually an upstanding member in the neighborhood. While it is unfortunate that he has made some bad decisions…I was surprised to hear of the misconduct, it comes as no surprise that he is ready to accept responsibility for his actions. I believe that as we move forward, he will emerge a better person.

(Letter from Mahamad H. Ahmed).

In sum, Mr. Ismail was born and raised in a harsh life but he has tackled the challenges head on. He is a valued member of his community, a good father, and his complete lack of criminal history proves he will remain law abiding. As such, Mr. Ismail respectively requests this Court sentence him to probation.

b. **Acceptance of Responsibility and Stigma of a Felony Conviction.**

Mr. Ismail was honest and admitted to all of the relevant criminal conduct, which again demonstrates his character.  Mr. Ismail states to this Court:

> Your Honor, I [want] to share that I am very sorry for my poor decision to lie on my application for a passport. I was driven by my desire to see my family and I made this very bad decision. I accept responsibility for my actions, and I am learning a hard lesson sitting in jail.

Moreover, the stigma and collateral consequences of a felony conviction are especially daunting to Mr. Ismail, an immigrant to the United States.   see *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir.  1982) ("The stigma of a felony conviction is

8

permanent and pervasive."); see *Wayne A. Logan "Informal Collateral Consequences"* 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave."); Id at p. 1107); *Michelle Alexander, "The New Jim Crow"* (Paperback ed. The New Press 2012) at p. 94 ("Once a person is labeled a felon, he or she is ushered into a parallel universe in which discrimination, stigma, and exclusion are perfectly legal."); Id at 163 ("When someone is convicted of a crime today, their debt to society' is never paid.'"); *Ernest Drucker, A Plague of Prisons* (The New Press 2011), at p. 130; *United States. v. Prosperi, 686 F.3d 32* (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed." ).

### c.  Hard Time Pre-Trial and Sentencing Variance

Mr. Ismail moves the court for a hard-time variance to account for the fact that conditions in the Sherburne County jail are spartan in comparison to a lower security prison where Mr. Ismail would likely serve his sentence.  See *United States v. Fiorito*, No. 07-CR-0212(1) (PJS/JSM), 2010 WL 1507645, at *39 (D. Minn. Apr. 14, 2010); *United States v. Edmonds*, 920 F.3d 1212, 1214 (8th Cir. 2019) (district court reduced prison time for "hard time" served pretrial); *Untied States v. Thomas*, No. 07-297(9) (DWF/JSM), 2012 WL 12896383, *1 (D. Minn. Nov. 12, 2012) (district court granted downward variance for defendant's pretrial custody at Sherburne County Jail).

In a Star Tribune article, jails were found to be far more difficult to survive than prisons.  The article explains that jails are used for short-term stays pending trial or

sentencing while prisons are designed for long-term stays and offer programming and treatment. *Andy Mannix, Minnesota Prisoners Decry Aimless Limbo in County Jails, STAR TRIBUNE, Mar. 13, 2016* (available at http://m.startribune.com/state-s-prisoners-decry-aimless-limbo-in-county-jails/371865301).

Mr. Ismail term of detention of over seven-months prior to sentencing at the Sherburne County jail is unique given that the guideline range for this offense has a low-end range of less time in prison then he has already served on pretrial detention. Simply put, time at Sherburne County is spent mostly in a cell. The day in a life of a prisoner at Sherburne County jail is not comparable to the day in the life of a prisoner at a low security Bureau of Prison facility.

## CONCLUSION

Abraham Lincoln stated, "I have always found that mercy bears richer fruits than strict justice." "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised, subject to the reviewing court's ultimate authority to reject any sentence that exceeds the bounds of reasonableness." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). In this case, a sentence to probation is fair and just.

                                                      Respectfully submitted,

Dated:   November 2, 2022.         */s/Patrick L. Cotter*
                                                      Patrick L. Cotter
                                                      Attorney No. 0319120
                                                      Attorney for Defendant
                                                      105 Hardman Court, Suite 110
                                                      South St. Paul, MN 55075
                                                      Phone: 651-455-1555
                                                      Fax: 651-455-9055
                                                      patrick@siebencotterlaw.com